**Matthews Estate**

*George E. Fowkes* and *Andrew W. Forsyth, Jr.,* for accountant.

*Craig T. Stockdale*, for Allegheny County.

*William H. Weber, Jack Palkovitz*, and *John M. Gobico*, for creditors.

RAHAUSER, J., April 9, 1969.—Gordon H. Matthews died September 19, 1966, a resident of Ben Avon, Allegheny County. His last will was duly probated September 30, 1966. The Union National Bank of Pittsburgh was named executor.

The Union National Bank of Pittsburgh filed its account September 28, 1968, wherein the account stated that there was $9,355.45 for distribution.

The account came on for audit November 20, 1968, at which time a supplemental account was filed indicating $9,518.88 in assets and claims against the estate in the amount of $147,551.64.

Hearings were held on numerous claims. A number of claimants were not present at the audit and their claims for approximately $90,000 were accordingly dismissed. The remainder of the claims came on for adjudication and for proportionate allowance. The estate is obviously insolvent, so the claimants will receive only a pro rata share of the amount allowed each of them. The decree will reflect the pro rated amounts. . . .

The final matter relates to the adjudication of the claim of The Fireman's Fund American Insurance Companies, hereinafter referred to as the insurance company, in the amount of $11,646.38.

The counsel for the insurance company first offered in evidence a computer print-out from a taped record of the company, indicating the amount due the claimant from the deceased. Other claimants objected to the computer print-out as not being the original record of the claim and further that it was a summary and not a daily itemization of transactions as required by the Uniform Business Records as Evidence Act.

The insurance company maintains that the computer print-out which it submitted in support of its claim is admissible under the provisions of the Uniform Business Records as Evidence Act of May 4, 1939 P.L. 42, 28 PS §91a, et seq. Section 2 of that act reads as follows:

"A record of an act, condition, or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The court accordingly must determine whether the insurance company has met the requirements of the said statute as to the computer print-out offered in support of its claim. The insurance company presented Ferdinand Gladzik, its credit manager, as the custodian of its records and a qualified witness as to its records. He testified as follows:

"Q. As Credit Manager, what are your duties?

"A. My duties are to conserve the assets of the company, control the billing, see to it that they are properly sent out by the people working under me. I supervise the entry of the daily reports in the machine room. I also control delinquent agents accounts that are submitted to me for collection and final determination.

"Q. But to summarize your duties, as they pertain to the matter in question, are you in a position to state — I am putting leading questions in order to hurry the thing up — that you are responsible for the control of the records from the inception of their receipt at your office, through their entire record devices, until such time as they are paid?

"A. Yes, I am responsible for the complete entry, and supervision of the people under me, to see that they are properly carried out.

"Q. Would you tell the Court in detail what would occur after the Matthews Agency issued a policy, either in your office or any branch of the American Insurance Company?

"A. If the Matthews Agency issued a policy, the policy would be typed up, the premiums shown thereon, and the policy would normally be delivered to the insured, with a bill by Matthews.

"There are three copies of the daily report, which are sent to the branch office. The branch office keeps one copy. The processing copy is then sent to the regional office. The branch office checks out the rates, and makes sure that the premiums are properly set up and correct.

"When the region receives the processing copy of the daily report, it is submitted to our entry department and coded and an abstract placed on the processing copy of the daily report. From there it is sent to our tabulating room, and the punch girls will punch out the I.B.M. card with all of the information appearing in the daily report, which will give the policy number inserted, the effective date of the policy, the type of insurance, the gross premium commission, the commission rate, and the net premium. These cards are then set into an electronic data processing machine, and the cards registered on the tape. From this tape we bill our agents. In this particular case we billed Matthews; and at any time we can run off the tabulation sheet, which is known as the print-out.

"Q. Will you continue through the entire process from there on?

"A. From there on, in the Matthews case?

"Q. Yes, in the Matthews case only.

"A. On receiving advice of the decease of Mr. Matthews, I received instructions to immediately freeze the account; and arranged to have the tape print out the entire unpaid premiums on September and prior business which was all that was available at the time. This print-out was made on October 16, 1966, and indicated a total net balance of $20,-789.79.

"Q. For the purposes of this matter, are you in a position to state that the net premium, as shown from the tabulations that you refer to, are run in the ordinary course of your business; that these are true and correct to the best of your knowledge and belief?

"A. The tabulation sheet as it comes off from the machine, is the actual amount of the total indebtedness as it comes out from the machine.

"American Insurance Company's Exhibit No. 2
Shown to the Court

"Q. Mr. Gladzik, I show you American Insurance Company's Exhibit No. 2, and ask you what that represents?

"A. This exhibit represents the entire outstanding balance of the policies premiums that were not paid to the American Insurance Company as of October 14, 1966.

"Q. By whom? From what agency?

"A. The Gordon H. Matthews Agency.

"Q. Does this tabulation represent what you have described previously, as a result of your daily business operations that are fed by your devices into the tape magnetic machine?

"A. Yes, sir.

"Q. Will you state to the Court what the balance shown is as the net premiums due to the American Insurance Company? As of October 14, 1966?

"A. $20,789.79.

"Q. The machine has compiled this list on the basis of what code that has been assigned to the Gordon H. Matthews Agency?

"A. The Gordon H. Matthews Agency has been assigned a code number 37 007 557. This code is assigned by the state number 37, County 007, and the agent's code 557. Only one code is assigned to any agent. There can be no duplication."

On cross examination Mr. Gladzik further testified as follows:

"Q. Mr. Gladzik, in compiling this exhibit No. 2, it is a run-off from a magnetic tape?

"A. Right.

"Q. Is there any way of deleting anything from this magnetic tape, prior to the run-off?

"A. No, sir.

"Q. There is no way of deleting anything from the magnetic tape?

"A. No.

"Q. Is there any way of making a correction on this magnetic tape prior to the run-off?

"A. No.

"Q. What I am trying to get at is whether or not there is a method by which a particular entry can just be obliterated from this magnetic tape?

"A. There is a method by which you can correct something, but it will always come at some future date. There always is a record of the entry.

"Q. In other words, this record here is everything that was processed in September, 1966, and prior thereto.

"A. Yes. We have an effective month and we have an effective year, and we have an entry date appearing on the tape; and they run-off a record, that is the premium record, before transmission for making bills, and it has an entering date on it. Now, any sub-

sequent erasure or any falsification of records under any circumstances must carry the current date that is entered into the machine.

"Q. Yes.

"A. I could not change this record on October 14th.

"Q. In other words, what you are saying is, if we have a written record like this and someone went in and erased one line from the record — that is the original record—, then you could see that it had been erased?

"A. Yes.

"Q. In this magnetic type process, nobody under any circumstances whatsoever could go in and eliminate any entry from the same; that it would be physically impossible to do so?

"A. It would be impossible .

"Q. In other words, let us explain —

"The Court:

"Q. Another entry in the machine must be made?

"A. Yes, sir. Now, if you wanted to eliminate any one of these items, you can only eliminate it by another abstract, and that is fed into the machine at a later date."

In measuring the qualifications and testimony of Mr. Gladzik against the quoted provisions of the Uniform Business Records as Evidence Act, we see that he is responsible for the records of his company from the time the copy of the daily report is received by the regional office of his company, after being prepared by the agency and forwarded through the branch office of the company, until the data on the daily report is set into an electronic data processing machine and registered on a tape. This tape is the final record of the company as to the data which was originally prepared by the Matthews Agency, and other similar agencies of the company. From the tapes so prepared,

and under the control of the witness, the insurance company bills its agents, such as the decedent. This is done by means of a tabulation sheet referred to as a print-out. This print-out furnishes a detailed record of each transaction on which the agency concerned is indebted to the insurance company and gives the net balance due such company as of the date set forth on the print-out. Such a print-out was prepared in this estate and was offered in evidence as exhibit No. 2. It shows the indebtedness of decedent to the insurance company as of October 14, 1966, subsequent to the date of decedent's death, in the amount of $20,789.79. Mr. Gladzik testified that this print-out was prepared in the ordinary course of business and that it was true and correct to the best of his knowledge and belief.

There is no testimony to the contrary. The testimony indicates that the source of the information on the tape is the daily report of the agency, which, as the name indicates, is prepared at or near the time of the transaction giving rise to the indebtedness. The agency which is the source of the information ultimately placed on the tape is the logical source of the information with normal inducements to initiate accurate reports to the insurance company which it represents. The method of making the reports daily, checking and encoding them promptly and consolidating them on tape comprise a system of record keeping which is designed to maintain records of the utmost accuracy. The court is of the opinion that the sources of information and the method and time of preparation of the business records of the insurance company, and more specifically of its exhibit 2, is such as to justify the admission of this record in support of the claim of the insurance company against the estate of Gordon H. Matthews, deceased.

The admission of the product of an electronic data recording system in evidence is simply a logical development of the old common-law shopbook exception to the hearsay rule. Records of many large corporations which were formerly kept in ledgers are now kept on tape. The information stored on the tape is available when desired through a device which prints out the information stored on the tape in readable form on a tabulation sheet, referred to in this case as a print-out. When the court assures itself that the information recorded on the tape has been so recorded from other sources which are prepared in the regular course of business, in a timely manner designed to initiate and forward accurate records for ultimate recording on such tape, there is no reason why a print-out of such tape should not be received in the same way as a business ledger has heretofore been received as a business record.

The final form of the record is not material so long as it is the end product of a system which is designed to produce a record which is accurate and reliable. As a practical matter it would have been impossible to produce each of the persons who had a part in the preparation and forwarding of the various reports which culminated in the tape and the print-out derived from it. If the print-out is not admissible in evidence the insurance company has no record which could be submitted to the court in support of its case. We do not believe that such a penalty should be placed on modern bookkeeping methods. We believe that the Uniform Business Records as Evidence Act makes print-outs of electronically produced record tapes admissible in evidence if the testimony of the custodian of the record, or of a person familiar with the system under which the record is prepared, testifies in support of it that the record was prepared in accordance with the requirements of the said act.

The only case which this court has found relating to the admissibility of print-outs of electronically recorded tapes is Transport Indemnity Company v. Seib (1965) 178 Neb. 253, 11 A.L.R. 3d 1368. That case involved a suit by an insurer for premiums due from the defendant, who owned a fleet of trucks covered by the insurance. In support of its claim the plaintiff insurance company offered its exhibit 14, a print-out of its electronically taped records. The records showed the calculations of the premiums due from defendant and the aggregate amount of such premiums. Plaintiffs' director of accounting testified in great detail as to the source of the information recorded, the mode of calculating the premiums and the machine recording of the data on tape and the retrieval of the taped information in a form sometimes referred to as a print-out. The court in describing the records of the insurance company said, at page 1373:

"The information is stored on the tape and at any time the machine can retrieve a record such as exhibit 14 giving the losses paid to date and the premium paid and due according to the formula."

Nebraska has enacted the Uniform Business Records Act in the same form as the Pennsylvania act, and this act was relevant to the question of the admissibility of the said print-out. The court held that the print-out was admissible under the act, saying at page 1374:

"No particular mode or form of record is required. The statute was intended to bring the realities of business and professional practice into the courtroom and the statute should not be interpreted too narrowly to destroy its obvious usefulness. United States v. Olivo, supra.

"The machine here performs the bookkeeping task in the usual course of business. Instead of on paper,

the information and calculations are stored on tape and may be retrieved and printed at any time. The tape record furnished a cumulative record based on information flowing into the office of the plaintiff company day by day and fed into the machine in response to a systematic procedure for processing each insured's account.

"Defendant argues exhibit 14 is inadmissible because it was prepared for use in this litigation and trial, citing Higgins v. Loup River Public Power Dist., supra.

"This argument exalts the form over the substance. The retrieval from the taped record (exhibit 14) was made for the purposes of the trial. But, the taped record and the information and calculations thereon were made in the usual course of business and for the purpose of the business alone. There is no merit to this contention."

The auditing judge is in accord with the opinion of the Supreme Court of Nebraska as expressed in Transport Indemnity Company v. Seib, supra. We are of the opinion that the record produced by the insurance company in the present case, as identified, explained and vouched for by its credit manager, Mr. Gladzik, is admissible under the terms of the Uniform Business Records As Evidence Act. While the printout, identified as exhibit 2, shows that Gordon H. Matthews, deceased, was indebted to the insurance company as of October 14, 1966, in the amount of $20,789.79, exhibits 3 and 4 of the said company show that subsequently the estate of the said decedent was entitled to credits in the total amount of $9,-149.11, leaving a balance of $11,640.38 due the insurance company. There was no testimony which would cause the court to question this claim in the latter amount, and it will accordingly be allowed.

A decree will be entered in accordance with this opinion.